Good morning, Your Honors. May it please the Court, my name is Leslie Bowman, and I'm before you today on behalf of Mr. Gonzalez-Lopez. What I'm going to try to do is limit my portion of the argument to about six minutes reserved time for co-counsel because our issues don't overlap pretty much at all, and then we'd like to reserve about two or three minutes jointly for rebuttal. Your Honors, based on the limited amount of time I have to argue, what I wanted to focus on is the issue of standing in regards to the motion to suppress evidence that has to do with the asserts that could provide standing to him to argue the motion to suppress. One of them would be that the barn or the metal shed was within the curtilage of the home or the trailer that he was staying in as an overnight guest, and the other has to do with the expectation of privacy on a curtilage argument. There doesn't seem to be much dispute that Mr. Gonzalez-Lopez was invited to the property and that he was an overnight guest. He stayed in a little trailer on the property, and he did have very limited belongings with him, but he had his wallet, his clothing, a few other personal items. The government doesn't seem to be objecting to that, and the court found that if we were talking about items being found in the trailer, that it appears that he would have standing in the trailer. But we're not. We're talking about the shed or the barn or however it's characterized. Right. I'm kind of hard-pressed to figure out exactly what his basis is for claiming a reasonable expectation of privacy over whatever happened to be found within that structure. Your Honors, that is exactly what the issue is. And what we would argue is that that barn or that shed was within the curtilage of the home. Now, the test for that or the inquiry would be based on the case of United States v. Dunn. And what the court needed to look at was the proximity of the home to the shed. There was an aerial photo that was submitted in the government's supplemental excerpts of record. The problem with it is that it's very difficult to see. It's on page one of the government's excerpts. I do have the original aerial photograph with me, if it's easier to see. I want to ask a slightly different question, continuing this argument about curtilage. I understand the concept of curtilage, and I've dealt with it in the case of people who are owners or permanent occupants of property. But you're talking about somebody who is at best a transient overnight guest. Does that mean he's got a reasonable expectation of privacy that we recognize for everything that the homeowner might have a reasonable expectation of privacy to claim? I think the argument could be made. Well, you are making the argument. The argument could be made, but where is there any authorities for the proposition that staying there one night gives you all the rights of a permanent resident? Well, it depends on what the activities were on the property. And apparently from the testimony that occurred at trial, Mr. Gonzales-Lopez wasn't restricted just to the trailer. In fact, it appears that he only slept in that trailer, but that he was on the property for a number of different purposes and was actually seen by the agents at the what we'll call the barn or at the metal shed. He was seen in that area. His activities extended to that area. It is not the same as if an overnight guest is in someone's home and perhaps has not gone into the garage, has no connection to the garage, something like that. Ms. Bowman, just on your curtilage argument, whatever the legal merit of it, what's the distance between the trailer and the shed? Your Honor, that is a great question, and the problem is I don't think we really know that from the record. The only thing that I have to refer to is the aerial photo. The entire property is 10 acres, and it appears from the aerial photo that when you drive in this long driveway from the public road, that you end up in a little circle, and on that circle are two trailers and this shed. So they appear to be in close proximity from the photo, but I couldn't find anything in the record that would give us an actual distance in terms of yards or feet. Okay, thank you. On that point, though, I would argue that because it was a very large property and there were other buildings and I guess some junk cars and things like that that were a farther distance away, that the items that are around this little circle on the main driveway would be considered curtilage. And that is also based on the second prong of the Dunn test, which talks about whether the curtilage is enclosed. In other words — You know, counsel, I couldn't find a place in your brief that you referred to the curtilage. I see that you have a reference on page 18 to the Dunn case. Does everything sort of get subsumed in that? I realize that you are not the author of the brief. I'm not the author of the brief, although I won't use that as an excuse because I did adopt the brief. Your Honor, I believe that the only reason that case would be cited would be for the curtilage argument because that is specifically what the case of United States v. Dunn sets out, are the four — Did you state in your issues in your brief that there was an issue about scope of curtilage? Your Honor, I'm not entirely positive that that word was used, but I know that the discussion on page 18 talks about the physical proximity, and I would submit to the Court that the discussion about the physical proximity should have used the word curtilage, but that it didn't use the term of art, but that's the argument that's being made. I wonder if you don't — you indicated before, I think, in response to my earlier question, that as a guest, we should pay attention to where he actually went, and there being some evidence to support the proposition that he might have entered the barn or the shed. And it seems to me this starts to point toward the other element of — or other version of standing that you asserted based on his business purpose being there and points very much toward our Court's recent decision in SDI, which you identified, to your credit, in a 28J letter, but I'm not sure that case gives you much comfort. Could you explain how you think SDI could be of assistance to your client? Yes, Your Honor, and I'm going to respond very briefly because I don't want to step on my co-counsel's toes here. But, Your Honor, I think that it basically sets forth a three-pronged test, and one thing would be if the defendant had immediate control of the item seized. There's an argument that he did, since he was found near the shed, and obviously the government's theory is that he was in charge of the marijuana that was in there. And also whether he took any steps to secure the area or the item seized, and I would submit that by approaching the agents and trying to keep them off the property that he did that. Now, the first prong, whether the item's — It's kind of hard to plead facts in the alternative, which is sort of where we are now, because I don't know the — is there any authority to support the proposition you can give one set of facts to assert standing and deny all those facts as part of your attempt to avoid an adjudication of being guilty for the crime charged? Because it seems to me you take what he said with regard to the crime charged, and he's busy saying this isn't mine, I had nothing to do with it, I don't have any control over that, I just happen to be passing through. Well, Your Honor, that is a problem. There's obviously a — So I'll go back to my question. Is there any authority that permits him to plead facts in the alternative? Not that I'm aware of, Your Honor. Okay. I'll turn this over to my co-counsel. Thank you. I helped take your co-counsel's time, so I'll be sufficiently understanding, I hope, in giving you sufficient time to develop your argument. Thank you, sir. Stephen D. West, a peer, and on behalf of Anthony and Richie. I'm going to try to make this as quick as I can and to the point. I think the analysis here, first of all, is my client's complaint is that the government refused to give him recognition for his substantial assistance. There's no issue in this case presented by either party that there was, in fact, substantial assistance as a given. The problem that we came into was the plea agreement that the government proffered to us because it refused to recognize the fact that my client was safety valve eligible and was seeking a sentence of 20 years, a mandatory sentence. And when we went to court at the time of sentencing, the U.S. attorney essentially told the court that, and I'm quoting, in fact, the issue of whether or not defendants' mandatory minimum sentences could be trumped. I think trumped is the proper word because we're trying to figure out what legally has supremacy. That didn't even come up until right before the defendant pled guilty. That's what the U.S. attorney told the court on February 5, 2007. In October 12, 2005, I had written to the prosecutor and explained to him that my client was safety valve eligible. I got a reply indicating that, in fact, he's looking at mandatory sentencing. He proffered a plea in the amount of 15 years, and later he proffered a plea of 13 to 15 years, coming down from the 20-year sentence because of my client's, quote-unquote, substantial assistance. I asked the probation office to give me a criminal settlement report to assist us in trying to resolve this case. Back in November 21, 2005, we received that report, wherein the probation office clearly stated that none of the defendant's prior convictions are accountable due to the dates of the imposition of the sentences, which placed my client clearly in the safety valve consideration. Counsel, what do you have to prove here in order to prevail? Well, I think I have to show that there was some arbitrary actions on behalf of the ---- By the district court or by the government? Well, I think the arbitrariness must be by the government abusing its power, vesting it to make the motions. And it would be arbitrary if the government did what? If they failed to treat my client like every other client. Okay, so you'd have an equal protection claim. Absolutely. Okay, and an equal protection claim based on what level of scrutiny? I think this Court should be looking at it in terms of de novo. Are you claiming that ---- well, de novo wouldn't be one of the levels of scrutiny if we're looking ---- if we're talking about the equal protection clause. You can get strict scrutiny if you think that the government discriminated against your client on the basis of race. If it was gender, then you may get heightened scrutiny. And if it was anything else, then it's going to be rational basis scrutiny. I think we're looking at rational basis. Okay, so in what way was the government irrational in the way that it treated your client? Well, their assertion that they only just became familiar with the concept of safety valve during the pendency of my client's sentencing is irrational. Safety valve is a fundamental part of the sentencing guidelines. It's first-year prosecutor material that they should know. I think I may have missed something here, but is it the case? I mean, is it your argument that the government didn't say, no, he's not properly eligible for the safety valve, but that the government said, I don't know what safety valve is all about, I don't do that? I mean, didn't the government say with regard to Mr. Ritchie, they don't think he qualifies? That was their position, that he was rather looking at the mandatory 20-year sentence. So I don't understand how the government's familiarity with the safety valve makes any difference. Because they were in error. They were clearly in error. The safety valve, both from the proffers that I provided to them, along with the criminal sentence report, settlement conference report by the probation office, set forth the fact that my client's safety valve eligible. Therefore, I negotiated a plea. And one of the reasons they said that they didn't move was because my client rejected the government's plea, which, in fact, we did. We rejected the idea of pleading to something that was far in excess of what my client was actually looking at under the terms of the guidelines. And second, the other reason that the government said that we're not entitled to this is because we made him prepare for trial, when, in fact, he was preparing for the co-defendant's trial, regardless of what my client's conduct ultimately was. But the bottom line was he's suggesting to this Court in 07 at sentencing that this issue of whether the safety valve or the mandatory sentence should be applicable in this case. He's saying that just came up just prior to us entering our change of plea, which was November 21st of 2006, where a year earlier we had repeatedly addressed these issues. Had we had a fair plea proffer from the government, Mr. Ritchie would have pled, because that was his intentions throughout. His cooperation was immediate. You know, so the only issue is why is the government withholding this motion? And they're saying they're doing it because we rejected their plea. Well, what plea were we supposed to take? An illegal plea for 13 or 15 years? You didn't. Could you have negotiated this in your plea deal? We had no plea deal. And did I attempt to negotiate? Repeatedly, over and over again. Your client agreed to plead without a plea deal. That's correct. Then he simply has to rely on the government to make the motion. That is correct. If the government doesn't move, then the district court's really not an abusive discretion on the part of the district court to refuse to do it if the government doesn't move. Unless the court says it does not have the power to do so, which is what the court said down below, that they didn't have the ability to do that. There's case law already that controls, which is incorrect, because this court has repeatedly said, no, we're going to look at what's the rational purpose for the government to ‑‑ what's the rational reason for them to give me a plea agreement for 13 or 15 years when, in fact, my client's looking at the guidelines that are starting at 70 months? Where's the rational government interest in that? And I submit to the Court that there simply is not. If they have your argument, we'll, under the circumstances, we'll still give each of you a minute for rebuttal. But now we'll hear from the government. May it please ‑‑ excuse me. May it please the Court, my name is Bruce Ferg, Assistant United States Attorney on behalf of the government in this case. I'll address the arguments in the order that they've been given to you. First of all, Mr. Gonzalez-Lopez has limited his argument to the question of his standing, suggesting that somehow there is a curtilage basis for him to suggest that he had standing in this case. However, the idea of curtilage is something that belongs to the homeowner or the ordinary occupant of the place. And I, at least, am not aware of any case which has suggested that just because there's an overnight guest, assuming that he's even that, and we do dispute it, that they then have standing to wander around the property and assert that they can object to the search or seizure of things outside of the residential area in which they supposedly are located. And I do emphasize that we are controverting whether or not he was an overnight guest. All we have, basically, is his word for it. And there was nothing found in that trailer which had no electricity, no running water, nothing which would make it an ordinary guest kind of residence or guest-type facility. Do we have a factual finding by the district court to the contrary? The district court didn't find it necessary to address that because he pointed out that even if there was some kind of standing with regard to this dilapidated motorhome or trailer in which only the defendant claimed that he'd been there and there is no identified host, no one who actually has shown to have any real control over the property, that that was beside the point because he did not show that he had any relationship, legally recognizable relationship, to the ton of marijuana over in the... I hear what you're saying, but I assume you're not trying to ask us to make a factual finding with regard to whether he'd been there overnight or not. The record is what it is. Well, the issue is to prove standing is the burden on the defendant, and therefore it was his responsibility to prove that, in fact, he had standing. And he has at least offered some evidence that he was an overnight visitor. Now, that evidence might not be deemed credible in the end, but there is evidence offered in the record. Well, even assuming that what he says is credible, which is dubious given the multiple contradictions that he had throughout the case, in this court's cases of Silva and Armenta, which dealt with very similar situations, there were defendants who had much more evidence that they were, in fact, overnight guests. And this court said, no, it's not enough. There had to be an identifiable host, which there is not. There is this mysterious person whom nobody has any evidence that even exists. In Armenta, I believe it was, the defendant actually had a key to this shed, which would tend to suggest that he had some kind of reasonable amount of control and expectation of privacy in it. And this court said, this is still not enough. And the lack of affirmative evidence besides his pure say-so, which the district court nor this Court needed to accept, indicates that he did not carry his threshold burden of proving standing. Well, not to push too hard an issue which I don't think really speaks to us, but my understanding of that case, and I have at least one of them, Armenta, in front of me, the Court of Appeals was reviewing a determination by the district court that there was not standing because he wasn't an overnight guest. There is no such finding here. I don't see, I don't understand the government to be arguing that we should decide to make factual findings on our own. The principal government arguments on something else is a reason really for us to try to make a factual determination the district court hasn't made here. We don't need to do that, do we? That's only the suspenders to go with the belt. Let's go back to the belt. Because you do have the authority to affirm a judgment on the basis of anything that's in the record. So the bottom line, though, is that, again, it's the defendant's burden to demonstrate that he has a reasonable expectation of privacy in the place that was searched, which is the barn slash shed, whatever we want to call it. I have a recollection, and I must admit that I cannot point to the place in the record where it specifically says that, but I thought there was testimony that there was about 30 yards distance between this dilapidated motor home and the shed. Our supplemental excerpts of record, page two, shows another photo, exhibit three, which shows the shed with the truck parked in front of it, and far in the background, you can see what appears to be the motor home or trailer in question. So it's a significant distance away. But, again, there is no legal authority that even assuming that he had some expectation of privacy in that trailer way over here in which none of his personal property was found, that should somehow give him the right to assert standing over basically anything else on the property, even if we call it heritage. Just because you as my guest, you know, come into my house and I allow you to do that doesn't mean that you are then have what society is willing to accept as a reasonable expectation of privacy in my separated garage 30 yards away. It's essentially the same situation. You didn't have reason to anticipate curtilage being the word of the day, but now that it's on the tape and you've stated consistent with my understanding that you don't know of any authority that supports the proposition that an overnight guest or an alleged overnight guest stands in the shoes of a permanent resident or a homeowner with regard to the doctrine of curtilage. Let me just ask, do you know of authority to the contrary? Is that a field that's been plowed before? I didn't attempt to attack it, so I can't really say either way. Counsel, is there any authority that a trailer that's not outfitted normally for residents that has no running water, for example, that it can have a curtilage? I know of none. And again, just the nature of the place is some evidence, I think, of what it's reasonable to expect about that place. Do I have a reasonable expectation of privacy when this unidentified host supposedly says I can go and stay there? As I recall the testimony, the defendant said, well, this unidentified host, this person that he ran into in a bar, said, come on out and we'll do something with cattle. But that didn't, there's no testimony that he said, well, you can wander around and do whatever you want on my property. So even if he was allowed to stay there overnight, which is unsupported by anyone but him, we don't have evidence of the extent of the authorization that would put him in a position to complain about what happened in the barn. Turning to Mr. Ritchie, his complaint on appeal is that the government did not offer him a substantial assistance motion. I believe that he's, the counsel here has somewhat misstated what the record says. If we read what the assistant United States attorney who was prosecuting this case actually said at the sentencing, he did not say that he was not familiar with the idea of safety valve. Actually, if you read the exchange of letters and the negotiating letters which are included in the defendant's excerpts, it's clear that there is a difference of opinion about what the safety valve could or should do. Whether or not it is simply something that might affect the range of sentencing under the guidelines or the extent to which it affects the apparently mandatory statutory minimums. And defense counsel took umbrage at sentencing and was brought up again about the idea of whether or not the, took the term trumped. And I think that that's significant because the authority that the defense counsel has offered as somehow telling the AUSA Giles in this case what he should do about the safety valve uses that term trump and that is the Cardenas-Juarez case which was decided just about a month before Mr. Giles filed his objections in which he acknowledged that it now appeared to him that the safety valve did in fact trump or require rule out of bounds the mandatory minimums. But the prior negotiating letters have to do with the counting as far as criminal history level and also there's issues about was Mr. Ritchie a career offender. And so we have a mix of potential sentencing options all of which are affected in different ways by his prior convictions. And so it was not a simple situation. As a matter of fact that Cardenas-Juarez had to say well in light of Booker although the safety valve statute appears to be mandatory actually this is the way you construe it in light of Booker. You do have to and so it's certainly not surprising that if a judge as in that case had problems with understanding exactly how all of these factors were to play out it's not irrational for an AUSA not to fully understand it until as he said he pursued the matter with a sentencing commission. And it was specifically in Cardenas-Juarez that the district court had used that term that the mandatory minimum sentencing statute seemed to trump the guidelines. So it appears that it was in light of that opinion that Mr. Giles presumably picking up on that same terminology acknowledged well okay this is my understanding but it was beforehand a rational understanding. The bottom line with both of the motions that were not made is that it is a discretionary function which Congress has put into the hands of the prosecutor. It's the defendant's burden under Espinoza-Cano to show that in fact there was not a rational basis for the government's position. And neither case has he done that. Mr. Giles indicated that the reason that he was not extending the third point was that in fact there had to be trial preparations. And the history provided in my brief shows that actually this case had been originally supposed to go to trial previous June, almost six months before. And that there had been repeated continuances at the instance of defense in which the government was forced to constantly re-subpoena witnesses, re-prep them, make travel arrangements, cancel all that stuff and come back. So it certainly was rational to say you have not given us timely notice, which is what he said, that you want to plead guilty. And since I do have a couple minutes left, there was a suggestion made in the defendant's brief that somehow he is being penalized for the fact that he filed a suppression motion. Again, as I pointed out in the answering brief, if you actually read what the prosecutor said, he was simply recounting the chronology of events which dragged the case out. And that, of course, is part of it. But I do suggest to you that this Court's Kimball case says that you don't have a motion or a suppression motion counted against you as long as it's at least legitimate. And in this particular case, this is where Judge Collins came up with the memorable statement that you have less standing than a butterfly with no legs. There was absolutely nothing supporting Mr. Ritchie's standing at all. And, in fact, as I pointed out in brief, at the time of sentencing, defense counsel acknowledged that he had told Mr. Ritchie that he had no standing, and they went ahead and filed a motion anyway, a motion that he effectively knew was frivolous. Now, that certainly is not timely seeking to plead guilty. The fact that you're negotiating doesn't amount to a timely notice of intent to plead guilty, because it's obviously contingent, and you can step back from that at any point. So there are others of the issues that were briefed but we've not talked about. If you have any questions, I'd be glad to address them. Apparently not. Thank you. You each have a minute. Your Honors, I don't know if the Court needs me to address the issue of the factual findings regarding whether Mr. Gonzales-Lopez was an overnight guest, whether there was an identifiable host or anything like that, because I don't think that this is the proper forum to argue those issues. But if there are questions about that factually, I did look some things up in the record. Here's not. It's your minute, so. I would like to make one correction, though. And I know Mr. Ferg very well, and I know that this was inadvertent. But the Exhibit 3 on page 2 that shows the metal shed, and Mr. Ferg speculated that the shed that was in the background is the shed that the defendant spent the night in. But it's not. And although I wasn't trial counsel, I conferred with my co-counsel who was actually at the property. I don't know anything in the record in terms of the 30-feet distance. You've used your minute. Thank you. Thank you, gentlemen. Just briefly, when we're looking at the colloquy that took place at the sentencing, I read in the record before, and I'm going to continue where I left off, it says, that didn't even come up until right before the defendant pled guilty, when he thought that that may release him from mandatory minimum requirements. This is a statement being made in February of 07, when I brought those topics up to this same gentleman speaking back in October of 05. And he's claiming my delay in bringing these issues up. And then he says he figured it out once he did some research and talked to the sentencing commission back in Washington, D.C. Those actions could have been taken easily back in October of 05, and we would not be standing here before this Court. Mr. Ferg said that the government had prepared for trial and that there had been the trial had been put off and put off and that they had been sort of put to their trouble, and that that was one of the reasons why the government decided not to offer your client the deal. And the government would have had to go to trial because of the co-defendant, regardless of any actions that were taken. But a trial against two people is different than a trial against one. And I agree. And that's why we pled before the trial began, to try to at least preserve some semblance of that issue. But why is it irrational for the government to say, look, when you plead on the eve of trial, even two weeks before after we've had a number of continuances of trial dates where we've had to get everybody prepared to file a subpoena, we don't think that you've come forward in sufficient time for us to be willing to give you the benefit of this date. Now, why is that irrational? Is that your burden? You have to show that this is absolutely and utterly unreasonable. The irrational part of that is the second prong as to why they rejected or why they said they weren't going to move. And that's because we, the defense, rejected the plea that would have caused my client to have a mandatory sentence twice the time that he was looking at under the guidelines. That's the irrationality. Thank you, sir. Thank all counsel for your argument. The case just argued is submitted. And we are in recess. We have some law students here, and the Court has agreed to meet with them for a few minutes. It's public, so counsel are welcome to stay, but it's not expected. And we are bound not to talk about the facts of your case, so don't feel like you have to stick around. Judge Kuhl, do you want to proceed now or do you like to take a short break? We can go ahead now as far as I'm concerned. Okay. Then we'll go off the bench and take these off and be back with you in a minute.
judges: Gould, Clifton, Bybee